in the Texas Hill Country somewhere. So, um, we're gonna hear first to the start. One and only case for the afternoon. 20-30815 Taylor v HD and Associates. And for Mr Taylor, we're gonna hear from Mr Hayes. So whenever you're ready, you're batting lead off today. So step right up. Good afternoon, Your Honors. Again, Preston Hayes on behalf of the appellant. Your Honors, I asked for oral argument today really to address the bonafide commission exception. And I thought that was important because the Fifth Circuit is yet to weigh in on that particular exception. Some other circuit courts have, the Third, the Seventh, the Eleventh, and a handful of district courts. But it's, I think, a matter of first impression for the Fifth Circuit. So I'll dive right into that. In order to qualify for the bonafide commission exception, there has to be an actual commission. And what the courts have looked to is whether or not there's performance-based incentives built into the pay structure and whether or not the way that they are paid is decoupled from the actual hours worked. So it's important to understand how, in fact, HD hired their employees, we maintain their employees, as well as how they were paid. So the way it happens is Cox is the company who hires HD. Cox bundles and sets forth the routes for the HD installers. That route is given to them. And that's done through the Cox app. And what happens is, as you'll see from the record of page 650, those routes are in certain slots. And those slots are 8 to 10, 10 to 12, 1 to 3, 3 to 5, and occasionally 5 to 7. And each one of those routes, each one of those time slots are assigned certain points. And that's points assigned by Cox. And the way it works is that our clients, my clients, get a percentage or a piece of that particular point assigned by Cox. I don't mean to interrupt you, but I thought you just said the points are assigned to time slots. Is that right? Well, it's assigned to the job, and the job is assigned to a time slot. Well, I mean, I think that could be important. So the points, let's say there's a 5-point job. Does that, and does that, what does that mean? Compare a 5-point job to a 3-point job. What's the difference? My understanding is that if there's a 3-point and 5-point, the difference being Cox sets those points based upon the time and complexity that they believe that particular job that's assigned the points is required. So what happens is the technician goes through the day, and he has slot number one. And what happens is he goes to the 8 to 10 slot, and he's there from 8 to 10. According to the app, he can't move on until that 10 slot arrives. Now, I went back and forth with can he go to a job early, and I really didn't get a clear answer from him. But what did come out of it is you have to take into account this is Cox's customer, and these are residential installation jobs. So what happens is if you can't go to that 10 o'clock job unless the customer says, yeah, I'll be home at 10, they can't run through their day as fast as possible without there being some assistance or accommodation from the actual Cox customer. If the Cox customer isn't home, doesn't agree to the slot being moved up, then they're required to just do the jobs as they come up in those slots as assigned by Cox. We think that the Almanzar case out of the Southern District of New York is directly on point. And it's factually on point. The pay structure was the same. The setup was the same. And in that case, you may be able to pick up more jobs at the end of the day. You may be able to do more work. That's not a decoupling of the hours worked from that. Now, there are a number of other cases out there that hold differently. And I will tell you one of the cases that comes to mind is Johnson v. Wavecom. That's also a cable installer case. Another case would be Moore v. Advanced Cable. But the big difference in those cases is there's a multiplier factor. And what I mean by that is they still get paid on a per-job basis. But there's also a multiplier built in based upon the technician's experience. And so what happens is the work gets done on a point basis. But at some point in time, there's a multiplier and that's based upon their skill and their speed. And that's determined by their particular level as determined by their employer. So those cases, in my opinion, are distinguishable. And the Almanzar case is directly on point. And that's, I think, the best rationale for this particular case. There's a lot of . . . you mentioned that case. And there's a lot of kind of sister I wondered if you were familiar . . . the other side in their brief points to a recent unpublished opinion from this court and Leal involving . . . it was an FOSA overtime case involving some, I think, auto paint employees. I think the timing of that case, I think it was issued after you filed your opening brief. They cited it, I think, on page 21 of their brief. I don't think you filed a reply brief or a 28-J. But are you familiar with it and what is your position on the applicability of it? I'm not familiar with that case, Judge, to be honest with you. I didn't pick up on that in the brief. The one case that did jump out to me that they cited a lot was the Casanova case. You know, that's a case where we got personal trainers in a gym and as I was reading through that, as I'm reading that opinion, I'm thinking, okay, this sounds a lot like a commission-based system. Because what happens in that case is if a personal trainer picks up, you know, 40 training sessions, then they're paid at a certain rate. Then if they work harder and they pick up additional training sessions, they're paid at a higher rate. And I'm thinking, well, this sounds like, okay, there's incentive base for working harder for hustling. I understand why maybe this case is different and why this may be a commission system. The court finds otherwise. The court in that case says, look, you have a one-hour training session. You can't make more money because you're going to have to be there for that one hour. So although the rate ultimately goes up, the more training sessions that you do, it doesn't necessarily mean your rate of pay goes up across the board. Your money is still tied to the hours because of what you're selling, which is an hour. Correct. Right? Correct. Here, though, is that true? I think it is, and I'll explain that. That's why I wanted to jump into the time slot issue because it's an 8 to 10 job. Whether you get that job done in 15 minutes or two hours, the only way you move on is if you get outside cooperation from third parties. Well, let's play with that for a second. So let's say you were assigned a job in the 8 to 10 time slot, and it's a five-point job. HD gets paid, I don't know, $10 for the job. You as a technician would make $5. Let's say you're really efficient and you're able to do it in 30 minutes. When can you move on and say, OK, I want some more jobs because I want to make a lot more money today? How can you move on to another job? So I would point you to the record where it's page 650 to 654, where I go back and forth with Mr. Davelier as I'm trying to pin that issue down. How do you move on? Can you swap jobs? Can you do them in the order you want to do them in? Can you just run through your jobs quickly? I don't get a clear answer on that, but what does come out of it is, well, it's customer-based. Remember, these are Cox customers, and Cox has already established that time when you're supposed to be there. So that's the time when you're supposed to be at that particular job. They never show up, though, when I need them to show up. I understand that. I think I should recute. I'm just kidding. But I understand that completely. I'm sorry. I understand the time slots. So you're saying the record is unclear on that point? I would say we sparred a lot on that issue, and what did come out of it ultimately was, look, it's customer-driven. It's customer-based. So that customer expects you to be there at 10. It's fine. You can move up if you can get the customer to agree to that. But at the end of the day, we have a contract. We have contractual obligations. It needs to be filled. So if the customer, and I think the words he uses, you don't want to drive across town for nothing if the customer's not home. Because remember, this is residential installation work, so they have to get inside your house. I got a call today from not an installer but a carpenter who wanted to come to my house at 3. He's supposed to be there at 5. I can't accommodate him because I'm here. So the idea that they can just run through their day and then be free to do other jobs, that's not necessarily true because they're dependent upon other people. They're dependent upon customers agreeing to that. And I'm not even sure how much that happened in practice. We don't have anything in the record to show day in and day out these guys were running through their jobs and in practice they were freeing themselves up for additional work. You know, so what's your view? I just read Judge Posner's opinion in Alvarado versus Corporate Cleaning Services. You're familiar with that case from the 7th Circuit about window washers? I am. That one you have some kind of point system. It does. One thing he emphasized in that case is due to the nature of the window washing business they couldn't work 8 hour days because weather and they didn't want to be attacked by Falcons. And I'm going to go to the link so I can watch one of those attacks right after this argument. So can you speak to that? Do the technicians work 8 hour days? Is it a regular 8 hour day? Well, that's the basis of the lawsuit actually. We claim they work much longer than 8 hour days because they have to be at the warehouse beforehand, traveling between jobs. Right, but I think the point is the nature of the work that they're regular work hours. It is regular work hours and I think even appellees point out it's a 4 day work week. Some days it's a 6 day work week, but they're regular work hours. They work during the day. It's not some kind of peculiar nature or some kind of seasonal business where they're only working during this particular set of time. And I'm glad you brought up the Alvarado case. In that particular case, I think the court ultimately finds the commission exception applies. But they also point out, but you know, we wouldn't have reached that conclusion if the commission would have been a regularly uniform interval scheduled 1 hour sales time frame. Which made me think, wow, that's our case. We have time slots. What also strikes me in that case, and it wasn't really clear from reading it, but it seemed like there were no time slots and it was wash as many windows as you can throughout the day. And I think that's where the comment about, if this was a regular interval time slotted 1 hour per sale, the outcome would have been different. So I don't think that that case, I think that case is distinguishable here. I think we're more like the Almanzar case because, and Mr. Daviler testified to it, and I cited in my public brief, the only way they make more money is to work more hours, to work more time. And I think his exact words were, if they want to make, earn more money, some want to work late. That in and of itself lends to the fact that there is no decoupling of the amount earned from the time work. Okay, so Almanzar, you think that's your best case, that's the 7th District of New York case. You cited a couple other, Johnson and Moore, those also district courts from other, outside the circuit? They are, and those were cases that were cited in the Almanzar case and saying, hey, here's why Almanzar is not like Moore and not like Johnson. And reading those cases, it becomes clear, what it boils down to is, there's an incentive to work more efficiently in the value of your hour. It actually causes the value of your particular hour to increase. Same as in the Swift Investments case, where they have flag rates. You're actually increasing your hours, and there's no cap, and there's no time slot. It's as fast as you can work, and you actually increase your hourly rate across the board. I remember something in the briefs, correct me if I'm wrong, that jobs can be rescheduled, meaning, not rescheduled, meaning someone isn't able to do all their jobs, those jobs can get bumped over to somebody else? Yeah, and I don't dispute that that's probably in theory could happen. I don't know if there's anything in the record besides Mr. D'Avaliere's statement that it does happen that way. But what it also doesn't say is why that particular tech was getting a job bumped over to him. How does that happen? There's no evidence that it's because they were fast and got through their jobs. It could have been the three to five job canceled. We don't know why that one tech couldn't get all of his jobs done, and why those other techs were maybe available. It could be the scenario that Mr. D'Avaliere talked about in his deposition, which I've cited, is that maybe he wanted to work late. If we agree with you, what do we do? I think it needs to be remanded. There's an issue of prejudice, too, that this is a late-filed affirmative. I just mean on the commission issue. I think that it needs to be remanded for trial. A quick housekeeping question. So the other side says you failed to comply with FRAP Rule 10b-2, and that you didn't put all the relevant evidence the district court considered into the record on appeal. What's your quick response to that? We requested the full transcript, and we assumed that that happened. In fact, when I got the record, it was a little concerning to me that it would have the record excerpt in there and had it as filed under seal. We called the clerk's office, and we said, I just want to make sure the court has available to it the entire record. I get it's under seal. No one else can see it, but does the court have access to it? And the answer is yes. All right. We'll see you back on rebuttal in a few minutes. And we'll hear now from Mr. Zimmer. Welcome. Good afternoon, Your Honors. My name is Charles Zimmer, and I'm joined by my colleague, Jonathan Lewis, here today. I appreciate you all taking the opportunity to look at this case. It is, I believe, a case, not necessarily a first impression to the entire circuit, but certainly at this level. I think one of the opinions points out the Crawford case, I think, that was used, the Casanova analysis, and said, you know, we're using the Seventh Circuit. We're using the Third Circuit because Judge Posner, you know, in particular, has written first the Yee . . . I hope I'm pronouncing that right, Yee . . . the Alvazaro case where he really fleshed this stuff out from an economic perspective, which, you know, clearly is important here because they are trying to get to the economic realities of what's going on. So, and there are, you know, I did want to point out there are courts that have dealt with the issue here. The Casanova Court, of course, was at Western District of Texas in 2016. The NRA Direct Touch South, which Judge Feldman did, and again, analyzed this and found in that case that because of multipliers that were being used, where the company was not passing on a direct percentage, you know, that it didn't apply in that case, but they did at least look at the issue. Then the Crawford case from the Southern District of Texas, 2016, which, again, summarizes the Casanova elements pretty well. What do you think, I mean, so the other side basically said, you know, there's time slots. This is, what you're making is not decoupled from the hours you're working. There's time slots. You know, there's a point system. It seems like there's a point system. So, what's your argument for why this is a commission? The way it works is, yes, there are time slots, but as you correctly pointed out, those are not contractual obligations where they're going to be followed religiously. These are estimates. My irritation with the cable company is not part of the record. No, it actually is quite relevant, though, because it is, like you said, the time slots are set slots. The size of the work to be done is not what's driving those time slots. They're just saying, look, the guy's going to be there at noon. He's got another appointment at 2. If it's a 10-point project where he needs to reset your cable box, okay, that's going to take five minutes. If he's got to rewire something from the street, he could be there all night or into the night, which then is what triggers how do you get other work. And I will note that in the jointly filed pretrial order, which is in the record at 1085, the plaintiffs agree that all of the technicians wanted to get more work orders to make more money. You can't get more work orders if there are only four slots in a day and everybody has four slots and we're all working at the same time. Now, some of the evidence that was not revealed to you that Judge LaMelle did have access to included expert reports that looked at the timing, looked at how long these plaintiffs worked, looked at do certain technicians make drastically more money than others even though they're all in this same quote-unquote block time system. When you say not revealed to us, what do you mean? They're part of the sealed record that wasn't brought up by the appellants. And the rule says the party attacking the judgment below must bring up all relevant records that are necessary to evaluate that charge. So it's not a simple thing here or a small thing because Judge LaMelle ruled on a factual record including detailed expert reports, time records, depositions and all kinds of other things that are not before you but you're being asked on the no-go review to say he did it wrong. I get it. So, I mean, leaving aside that sort of procedural issue, I mean, honestly, I have not looked closely at that, the sealed issue that you just mentioned. But let's assume I can go get them because we're the circuit. We can just say give us the records. Honestly, I was surprised it didn't come up on its own actually but yeah. Yeah, yeah. But we get it. So you're saying there's evidence in there that explains how the technician can make more money if the technician is more efficient. Exactly. And the analysis includes looking at these particular plaintiffs and showing that they were, I don't want to say bottom dwellers, but they're barely making the bottom. There are other people that constantly do better, people that have much more experience that can turn the jobs faster, get to the end of their routes and go, all right, PDA, I'm clear. Send me more. Do more. Do more. Do more. And they get better and better. And that's the deposition testimony that is in the record. Mr. Daviler does make that clear. The way to get paid more is to get more work orders and better work orders. Now there is some dispute, and I think it's more of a temporal issue, about how much HDA, the sub, had the power to say, look, that's a complex job. Let's give it to this guy. This is a veteran guy. We want to keep him. Let's give him better workloads because there was a lot of complaints about how I'm getting terrible workload. None of them want to go reset cable boxes every hour because then you're spending eight hours or ten hours or four hours, whatever it is. But you're not getting them any points. And so it works backwards, too, that yes, you could work more points or you can work less points, and they don't generally like that. And that ties very directly with the Yee opinion and the Alvazaro opinion, and several of the others that use flag scoring points. Yeah, I thought, are you the one who brought up the Layal opinion? Did you, sorry, did you cite the Layal opinion? The unpublished opinion by Chief Judge Van Owen? Layal? Layal is the Layal versus Magic Touch. Oh, Magic Touch. Yeah, I'm sorry, I was . . . No, that's all right. It's the, there's a flag system there, flag hours or something. I had that in my head as Layal, so I . . . Yeah, well, I'm Sergio Layal. I'm thinking Layal. And that is a good example where, I think Judge Posner kind of started that ball rolling where he talked about, you know, whether it's window washing or the collision center cases. You know, for the collision center case, for example, they bill the job to say your car has a fender damage. That's a five-hour job. They bill the client for five hours, but if the workers finish it in three, they get their percentage based on the five-hour job. And that goes, the Department of Labor's actual manual includes a reference that that type of system is okay, that it is not something that is subject to overtime because the employees can work nine hours and get credit for ten. An employee with less experience and skill would work ten hours but get credit for seven. And so it is not tied to the specific hours worked. And it is envisioned to create efficiency and to promote faster, better work, which is why it supports the FSLA's general, you know, the logic behind it. And I think Judge Posner put it in an interesting way in Alvisaro where he asked a question in that section after he'd done all this analysis and says, would it even be better for them if they got overtime? And it's such a strange thought because I'm like, well, obviously everybody wants overtime. And talking to the client, you realize, well, no, because here's what happened. We get $4 per point. We pay them, we pay the workers $2 per point. If you took the overtime rate they want to apply, then we have to give them $3 a point for overtime. Now they're unprofitable. They don't want to lose $1 left to cover rent, you know, all the other employees that are not in there. So it struck that that's exactly what Judge Posner was laying out in an economic stance that if this was applied, and they say you have overtime rates, they can't pay $2 per point. They'd have to lower that rate so that that rate times 1.5 would not go higher than whatever their break-even or whatever their profit margin is. So maybe it's a little above 2, but it's somewhere in there. So they would suffer, let's say they're working 50 hours a week. They would suffer a lower rate for 40 hours a week just to get to the original rate at the 40 to 50 hour time period. And the company would be like, you know, I'm losing money. I have to adjust the rate. So the overall impact is harmful, which is why no one joined the suit. This is a serial plaintiff who has sued three Koch subcontractors in a row for the exact same, not the exact same, that's actually importantly inaccurate, for a point-based system. They're calling it a piece rate, but I think if you do the analysis that we laid out, it doesn't fit the piece rate analysis. So the same parties are showing up saying, well, I sued over here for a piece rate system. You have a piece rate system. Let me sue you. Not hitting any of the details. And again, if you look at the record before Judge LaMalle, there's no countervailing evidence. There are arguments. The interstate commerce issue wasn't really addressed, but that's one where Judge LaMalle's opinion, I think, doesn't read as well as it should because he's responding to the arguments that were raised and an utter lack of evidence. They never said once, we conduct interstate commerce. Not through the handling clause, not through anything. They never touched it. They just said, yeah, we trigger this provision and they cite the provision. So that also flows into the side of the provision structure that there is tons of evidence available. We produced a massive amount of material that Cox tracks where they are, all the time, every minute. So there is a lot of data available and our experts were able to go through and build a lot of models showing that they don't work more than 40 hours often and that they are more profitable people who work better, not the plaintiffs. Mr. Hayes relied on the Almanzar decision out of the Southern District of New York. Do you want to distinguish that? Yeah, I mean this is something where there's not a dearth of cases. There's actually a lot of cases. These are all, I assume, cable technician type cases? Yeah, and this one I think that the quote that was most useful, it's in the opposition's brief says, the court found that no technician received additional payments as a reward for completing the work more efficiently. So in that system, whatever the details of it are, which unfortunately a lot of these cases don't get to that real you know, for example, the direct tech case I mentioned earlier where Judge Feldman found, yes, you have a point-based system. Yes, it's a commission of a type but sometimes they only get 13% of what you get. Sometimes they get 75% because it's not a straight flat rate. It doesn't qualify. So a case like that doesn't tell you a lot unless you know exactly what's happening and those, that's why HDAs is set up to where it's a pure 50%. You know, we get $4, you get $2 unless they're taking like Van or In-A-Loud or some other, you know, things but the flat rate is I get $4, you get $2. That's it. That took it out of most of the cases that always cause problems because other people who did that then added other stuff to it. You know, one of the cases, I think it was, yeah, the Magic Audio case. There they had diminishing marginal returns built into it. So yes, you could make more by working longer but every hour more or every job more you did, you got paid less and less and less. So you're discouraged from working those more. Again, that doesn't apply here. Here it's, you know, if you can make a million points, then you get a million points. So those are critical differences that I think, you know, again, Judge LaMelle had the ability with a full record to compare those apples to apples whereas, you know, opinion quote versus another one is a lot harder because you don't know what it was that drove the court to say they're not getting paid for the extra time. Um, very quickly . . . You want to distinguish the Casanova case is about trainers, I think. Uh, finds it's not a commission. But Casanova, and again, it's it's useless past the point that he sets up the analysis of the law. You know, the actual facts there obviously don't do a lot. But it was one of the better opinions that I think a lot of courts have looked to because it took what was, say that was 2016. So you had the 11th Circuit had reached a a good opinion in the Clindest versus Swift case from 2001 which flowed down to a couple of cable cases in Jones v. Tucker in Georgia and more of the advanced cable in Georgia. So you had a couple of courts doing that and obviously the Yee opinion was 2007 and Alvarado was 2015. So you were just starting to get sort of a critical mass of cases that were looking at this issue. I'll also note the Department of Labor obviously filed an amicus brief in this case challenging the Interstate Commerce side of the equation. They did not raise any issue with the findings based on the commission structure in this case, which I think is notable and obviously it's not a finding. They didn't say anything. But it was the part of the case that even if this applies, even if Interstate Commerce did or was the wrong way, the case is still resolved because if there's an exception that applies, it doesn't matter. So I think that is worth something as well to keep track of. The other issue I think to close, unless you have more questions of course, the Black Magic opinion by this court from 2020 I thought was very applicable here because in that case, you know I was talking about the I think it also goes to the commission side as well. The level of evidence necessary to survive Twombly or the plausibility standard is pretty easy. I mean now I'm honestly a little torn as to what's not included in the Interstate Commerce section. There's cases that say if you use laundry detergent then  would be in Interstate Commerce even if he never did anything but sell it to his neighbors because the chisel showed up from somewhere else. I think the test has kind of disappeared so let's say we're in it. But the Black Magic opinion I thought was very good at saying yes that standard is low but you're still at the summary judgment phase. You have to bring evidence and I think that's critical in this case that this is not an analysis of the theory level. This is not the plausibility of the arguments. It's after discovery is completed and done have you presented enough to do that? And I think that's my issue with the result that they're asking for to remand it back. You would have to remand it back and say well open up discovery again and Judge Lamel you need to tell them what they need to go find to do it because they've had access to the data. They chose not to hire experts. They chose not to put any facts in front of Judge Lamel that would refute this. So what's the point of remanding it? Would be my question. So any further questions from the court? Judge Higginbotham are you good? Do you have any questions? No I think you've covered it quite well. Alright. Thank you. Thank you sir. Okay we're back to you Mr. Hayes. What's the point of remanding? This motion for summary judgment was filed in September. Three months before trial. First time I ever heard commission was a motion for summary judgment. I talked about the deposition of Mr. D'Avaliere. It's in the record. You can see it for yourself. It was a sparring contest. Had I known this it was going to come up and we're going to allege commission this exception applies. Certainly the first deposition I would want to take would be the deposition of Cox. They write the programs. They assign. I don't know that Cox would be would have the same opinion that Mr. D'Avaliere has about the ability to move jobs and change jobs because it's their customers. So I didn't address what prejudice we suffered. That's it. I would have taken Cox's deposition for sure. I would have asked for their records too. Beyond that it's been suggested that the expert somehow carried the day for them. I have a different take on what the expert said that Mr. Zimmer does obviously. I don't believe they carried the day. I took his deposition. What it showed is sometimes the techs do work overtime. Now not to the degree that we say they do, but I was ready to call his expert in my case in cheap at trial. So the fact that it carries the day or it's unchallenged I disagree with that notion. But getting back to the bonafide commission performance based incentives what it really boils down to in my view of the cases is are we rewarding skill and efficiency? How can H.D. say they reward skill and efficiency when they don't even assign the work? That's done by Cox. They don't care how good you are. We don't know what their basis is. We don't know what their metrics are. The work just gets assigned. H.D. doesn't have a hand in doing that. So how can they say we reward skill and efficiency when you don't have a hand in that process? The magic touch case was brought up. I believe that in that case there is a different pay structure based upon skill. You're ranked on what you do. They all don't get paid the same. They get a different percentage of the job based upon their particular skill set. If I'm wrong about that I'll blame my colleague who just told me. That's what I believe the magic touch case stands for. Lastly, the fact that DOL didn't brief the commission issue while they do the things they do I'm not going to stand here and speak for the DOL but I do know what their brief said. It said that they were really concerned about this pretty much an issue regarding access to the court system under the FLSA. If there's no coverage under the FLSA you never get to court. I think they were concerned about small and local businesses and their employees not having rights under the FLSA. The bona fide commission exemption it's very case specific but when we talk about coverage under the FLSA I think that's what the DOL was concerned about. But again that's a question for them. At that point, your honors I'll answer any questions that you have. Alright. Appreciate it. That concludes our one and only case for the day and again appreciate your help with scheduling this.